258 P.3d 233

**YVONNE L., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, Emily L., Leona L. and David L., Appellees,**

**Tohono O'Odham Nation, Intervenor.**

**No. 1 CA–JV 10–0233.**

Court of Appeals of Arizona, Division 1, Department B.

June 16, 2011.

Thomas C. Horne, Attorney General by Michael F. Valenzuela, Assistant Attorney General, Phoenix, and Michelle R. Nimmo, Assistant Attorney General, Tucson, Attorneys for Arizona Department of Economic Security.

The Law Office of Denise L. Carroll by Denise L. Carroll, Scottsdale, Attorney for Appellant.

Tohono O'Odham Nation, Office of Attorney General by Samuel F. Daughety, Assistant Attorney General, Sells, Attorneys for Intervenor.

## OPINION

WEISBERG, Judge.

¶ 1 Yvonne L. ("Mother") appeals from the superior court's order severing her parental rights to E.L., L.L., and D.L.[1] Because the children are members of the Tohono O'Odham Nation, these proceedings are subject to the Indian Child Welfare Act ("ICWA").[2] In addition to the Arizona Department of Eco-

---

1. E.L. was born in 2001, L.L. in 2006, and D.L. in 2007. They became enrolled members of the Tohono O'Odham Nation in January 2010. No evidence established that any of the children's fathers were Native American or members of any tribe.

2. The ICWA is a federal statute that "allocates jurisdiction between tribal and state courts over Indian child custody cases and mandates certain procedural safeguards and substantive requirements for state court proceedings." *Valerie M. v.*

*Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334, ¶ 12, 198 P.3d 1203, 1206 (2009). It provides in part: "[T]o effect a ... termination of parental rights to [ ] an Indian child under State law [the State] shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2007).

nomic Security ("ADES"), the Nation was a party to the termination proceedings and requested leave to file a brief in this appeal. We granted that request. For reasons that follow, we affirm the judgment and the superior court's conclusion that clear and convincing evidence is the standard of proof for finding that ADES had made "active efforts" to prevent the breakup of this Indian family as required by ICWA.

## BACKGROUND

¶ 2 After L.L. was born exposed to marijuana and cocaine in 2006, Child Protective Services ("CPS") took custody of her and an older sister, E.L. ADES filed a dependency petition based upon Mother's substance abuse. In addition to drug abuse treatment, Mother received parent aide services covering instruction in such things as child care, discipline, and nutrition. In March 2007, ADES dismissed the dependency and returned the children to Mother.

¶ 3 On April 23, 2008, CPS responded to a report of physical abuse of L.L. and visited the home of Mother and David M., father of E.L. Alarmed at L.L.'s appearance, the CPS case manager urged Mother to take L.L. to a doctor. When that had not occurred by April 28, the case worker asked Mother to take L.L. to an emergency room. David M. took L.L. to a hospital, and the examining doctor noted that she was malnourished, had bruises all over her body, and a skull fracture.[3] CPS then took E.L., L.L., and a third child, D.L., into temporary custody. Mother and David M. agreed to submit to urinalysis ("UA") testing, and because Mother's test showed dilution, CPS did not return the children.

¶ 4 In May 2008, ADES filed a dependency petition alleging grounds of physical abuse, neglect, domestic violence, and substance abuse. Mother began submitting to random UA testing, and she was offered TERROS

drug abuse counseling in June 2008 but did not complete the program.

¶ 5 In July, the court allowed the Nation to intervene in the dependency. CPS arranged for Mother to receive drug testing and counseling, parent aide services, visitation, and a psychological evaluation. Mother initially failed to participate in intake for a parent aide but received a second referral in September 2008 and participated until she was incarcerated in November. Mother declined to participate in intensive outpatient services with TERROS and complied sporadically with drug testing. In August, the court found the children dependent and approved family reunification as the case plan.

¶ 6 In October, Mother was again referred for drug treatment but did not participate. Mother's parent aide reported that during visits with L.L., Mother did "not make significant efforts to connect with [L.L.] and instead focused her time on [the other children]." In November 2008, Mother was incarcerated for aggravated driving while under the influence, and as a result, parent aide services were discontinued. Mother also had been referred to Magellan Health Services[4] for counseling but apparently did not ever seek or obtain services there.

¶ 7 In a January 2009 report, the CPS caseworker noted that Mother had missed more than a third of her scheduled drug screenings. Mother also could not attend a scheduled psychological evaluation due to her incarceration, and the evaluation had to be rescheduled a second time because of Mother's illiteracy and the need for additional time. Upon Mother's release from jail in February 2009, CPS again referred her for parent aide services and for TERROS. Although Mother did not have a parent aide, she attended parenting classes and participated with TERROS until April. Mother

---

**3.** The case note stated that L.L. also had a distended stomach, patches of missing hair, severely chapped lips, bumps on her forehead, handprints on her right and left cheeks, at least nine bruises, and that she was weak and lethargic. Her foster mother said that when L.L. arrived at her home, she was very dirty, unsteady while walking, had sores on the bottom of her face and inside her

mouth, and a healing wrist fracture. Within a week, however, L.L. had gained two pounds.

**4.** Magellan Health Services, Inc. is the Regional Behavioral Health Authority of Maricopa County and provides publicly funded behavioral health care.

sporadically complied with UA testing until June.

¶ 8 In February 2009, the court by the clear and convincing weight of the evidence made findings under ICWA that if Mother had custody of the children, serious emotional and physical danger to the children was likely, that "active efforts [had] been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that [the] efforts have proved unsuccessful." 25 U.S.C. § 1912(d). At the request of the children's guardian ad litem ("GAL"), the court ordered ADES to provide Mother and L.L. with bonding therapy. On February 20, Mother's case manager attempted to arrange such therapy but was unsuccessful until she finally arranged for services through AmeriPsych. On two occasions in June, however, Mother failed to attend intake and never participated in bonding therapy.

¶ 9 In March 2009, Dr. James Thal conducted a psychological evaluation and diagnosed Mother with alcohol, cannabis, and cocaine abuse; physical abuse and neglect of a child; parent-child relational problem; borderline intellectual functioning; and dependent traits. He noted that Mother had been unemployed for over a year. Furthermore, he concluded that her lack of attachment to L.L. could imperil the child, who remained at risk for abuse and neglect. He was uncertain about Mother's ability to care "for any child at the present time" given her "exceedingly limited" resources. He recommended a bonding assessment and that L.L. remain in foster care; he thought individual counseling might be helpful to Mother but that "the probability for successfully reintegrating L.L. with [Mother] seems minimal."

¶ 10 In July 2009, Mother was again incarcerated until September 2009. At a July report and review hearing, the court found that Mother was not compliant with services and that David M. had moved out of the home. At an August report and review hearing, the GAL moved to change the case plan to severance and adoption. Mother opposed the change, but the Nation did not. The court ordered the GAL to file a motion for severance and made findings from the clear and convincing weight of the evidence and pursuant to ICWA that parental custody was "likely to result in serious emotional and physical damage" to the children[5] and that ADES had made "active efforts" to provide remedial services and that they had been unsuccessful.

¶ 11 GAL's severance motion alleged the statutory grounds of neglect, substance abuse, nine months out-of-home, fifteen months out-of-home, and prior dependency under Arizona Revised Statutes ("A.R.S.") section 8–533(B)(2), (3) and (8)(a), (8)(c), and (11) (Supp. 2010).[6] Mother contested the allegations, but the Nation neither opposed nor supported the motion. At the initial severance hearing, ADES agreed to continue to provide services once Mother was released from jail.

¶ 12 Upon her release in September 2009, Mother was referred to TERROS and completed classes. In October, she was referred for domestic violence classes and counseling to New Horizons, and she still was participating in domestic violence services during the severance trial in May 2010. In November, Mother identified a half-sister, N., as a possible placement, and ADES conducted an evaluation of N. and her home.

¶ 13 In February 2010, Dr. Glenn Moe, a licensed psychologist, conducted a bonding assessment of the children, Mother, and N. He concluded that L.L. and D.L. were primarily attached to their foster parents and that E.L.'s attachment to Mother had "dysfunctional and anxious components." Dr. Moe was concerned about N.'s ability to be a fit guardian because N. said that she would return the children to Mother and thought

---

5. A provision of ICWA states: "No termination of parental rights may be ordered ... in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

6. The GAL also moved to sever the parental rights of David M. to E.L., of G.T. to L.L., and of John Doe to D.L.

that Mother already was capable of parenting them. He also concluded that Mother "ha[d] not proven [herself] capable of correcting her deficiencies" and that severance and adoption were in the children's best interests.

¶ 14 A severance hearing began in April and concluded on May 10, 2010. ADES supported the GAL's motion; counsel for the Nation said that it did not support termination but would support guardianship in the current placements. The GAL, Mother, the Nation,[7] and David M., but not ADES, submitted written closing arguments.

¶ 15 In September, the court issued a lengthy ruling terminating Mother's parental rights on the grounds of neglect, the children's prior dependency, and both nine and fifteen months in out-of-home placement.[8] It later issued separate findings of fact and conclusions of law. It found, as Arizona law requires, that clear and convincing evidence supported each ground. It also found by clear and convincing evidence that "active efforts [had] been made ... to prevent the breakup of the Indian family," as required by ICWA, and that beyond a reasonable doubt, returning the children to Mother was likely to cause them serious physical or emotional damage. The court concluded that severance was in the children's best interests and that they were adoptable. Finally, it found good cause to deviate from ICWA's placement preferences and to order that the children remain in their foster homes.

¶ 16 Mother timely appealed. We have jurisdiction pursuant to A.R.S. §§ 8–235 (2007) and 12–120.21(A)(1) (2003).

### DISCUSSION

¶ 17 Although she did not raise this contention below, on appeal Mother asserts that "beyond a reasonable doubt" is the proper standard of proof for the superior court's determination under ICWA that ADES had made "active efforts" to reunify her with her children. She also contends that the court erred in failing to place the children with her half-sister, N. We turn first to the standard of proof issue.

¶ 18 The Nation contends that both Mother and ADES waived their right to argue the issue of the correct standard of proof by not raising it in the superior court. The Nation, however, urged application of the "beyond a reasonable doubt" standard of proof in its closing argument below, and the court's ruling discussed the question at length. Thus, we have adequate insight into the court's reasoning. And, given the fundamental nature of Mother's interest in custody of her children, we choose to consider the issue. *Christy A. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 299, 306, ¶ 22, 173 P.3d 463, 470 (App. 2007).

### Standard of Proof for "Active Efforts" at Reunification

¶ 19 Under Arizona law, before the superior court may sever parental rights, it must find that the moving party has proved one or more of the statutory grounds for termination by clear and convincing evidence. A.R.S. § 8–537(B) (2007). The court also must find by a preponderance of the evidence that termination is in the child's best interests.[9] *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22, 110 P.3d 1013, 1018 (2005).

¶ 20 When an Indian child is the subject of a severance petition, ICWA applies and requires the court to make two additional findings. First, and without specifying the appli-

---

7. Only the Nation questioned the proper standard of proof required for the ICWA "active efforts" finding.

8. The court severed the parental rights of the fathers of L.L. and D.L. on the grounds of abandonment and nine months in care. The court found that David M. had engaged in all of the services offered but that ADES had not made active efforts to provide domestic violence counseling and therefore declined to sever his rights to E.L.

9. Our supreme court noted that in response to *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Arizona legislature increased the standard of proof in a severance case from a preponderance to clear and convincing evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 19, 110 P.3d 1013, 1018 (2005). The court held, however, that the separate finding regarding a child's best interests, which became mandatory in 1994, was subject to a preponderance standard of proof. *Id.* at ¶ 20.

cable burden of proof, ICWA requires that before ordering termination of parental rights, the state "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).[10] Second, the court must find, based upon *"evidence beyond a reasonable doubt*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (emphasis added).

¶ 21 In *Valerie M.*, our supreme court rejected the argument that ICWA's "beyond a reasonable doubt" standard "applied to all state-law findings." *Valerie M. v. Ariz. Dept. of Econ. Sec.*, 219 Ariz. 331, 335, ¶ 16, 198 P.3d 1203, 1207 (2009). Instead, it concluded that ICWA not only "left to the states the identification of the grounds for termination" but "contemplated that procedures in Indian child custody cases would vary among the states" and "did not expressly address the burden of proof applicable to findings required by state law." *Id.* at ¶ 17. Mother argues, however, that because "active efforts" is a federal law requirement, the superior court erred in applying a "clear and convincing" standard and should have applied the same "beyond a reasonable doubt" standard that ICWA explicitly requires for the finding that parental custody would likely cause serious emotional or physical harm.

¶ 22 In response, ADES asserts that had Congress intended for the higher standard to apply to both ICWA findings, it would have said so.[11] Furthermore, it points out that although Arizona Rule of Juvenile Procedure 66(C)[12] formerly required proof beyond a reasonable doubt, the current version now mirrors our state law and requires that the grounds for termination be shown "by clear and convincing evidence and that [the petitioner also show that] termination would serve the child's best interests by a preponderance of the evidence." Moreover, like ICWA, if an Indian child is involved, Rule 66(C) states that a

petitioner must prove, beyond a reasonable doubt, ... that continued custody ... by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. The moving party or petitioner must also satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts have proven unsuccessful.

Nothing in the Rule mandates application of a "beyond a reasonable doubt" standard of proof for "active efforts"; it requires only that the court be "satisf[ied] ... that active efforts" were made and were unsuccessful.

¶ 23 Other state courts applying ICWA have adopted varying standards of proof for the "active efforts" finding. One court concluded that because application of "beyond a reasonable doubt" better protects Indian families, it would adopt that standard. *In re G.S.*, 312 Mont. 108, 59 P.3d 1063, 1071 (2002). Two courts have held that "logic" compels use of the "beyond a reasonable doubt" standard for both ICWA findings.[13]

---

10. The statute requires that "to effect a ... termination of parental rights to[] an Indian child under State law [the State] shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2007).

11. The Nation contends that ADES waived the right to object to the standard applied when it failed to file a closing argument following the severance trial. In any event, given the importance of this issue, we exercise our discretion to consider ADES' arguments on appeal.

12. In 2009, the Rule provided in part that in the case of an Indian child, the severance petition allegations had to be proven "beyond a reasonable doubt" and that this same standard applied to proof "that active efforts have been made to provide remedial services and ... that those efforts have proven unsuccessful." Our supreme court held that the Rule "impermissibly conflict[ed] with state statutes and could not impose a more stringent burden of proof" regarding the elements of the petition but did not address the burden of proof on a finding of active efforts. *Valerie M.*, 219 Ariz. at 336, ¶ 22, 198 P.3d at 1208.

13. An early Arizona case falls into this category, but we are not bound by a statement in *Maricopa*

*People in Interest of R.L.*, 961 P.2d 606, 609 (Colo.App.1998); *In re Welfare of M.S.S.*, 465 N.W.2d 412, 418 (Minn.App.1991). But, as another court has observed, it is equally logical to assume that Congress imposed one standard for one finding and allowed the states to choose the burden of proof for the other finding. *In re Vaughn*, 320 Wis.2d 652, 770 N.W.2d 795, 810, ¶ 44 (App.2009).

¶ 24 Most courts that have considered the issue have concluded from the absence of a Congressional mandate that each state may choose an appropriate burden of proof by which to evaluate reunification efforts and have opted for a clear and convincing evidence standard. *See, e.g., In re Adoption of Hannah S.*, 142 Cal.App.4th 988, 48 Cal. Rptr.3d 605, 612 (2006) (adopting clear and convincing standard and holding that "[a]ctive efforts are essentially equivalent to reasonable efforts ... in a non-ICWA case"); *In re C.A.V.*, 787 N.W.2d 96, 100 (Iowa App. 2010) (state version of ICWA requires "active efforts" be shown by "clear-and-convincing-evidence"); *In re JL*, 483 Mich. 300, 770 N.W.2d 853, 863–64 (2009) ("default" state standard of clear and convincing evidence applies); *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55, 60–61 (2008) (accord); *In re J.S.*, 177 P.3d 590, 591, ¶ 4 (Okla.App.2008) (accord); *In re Dependency of A.M.*, 106 Wash.App. 123, 22 P.3d 828, 832–33 (2001) ("clear, cogent and convincing" evidence); *In re Vaughn R.*, 770 N.W.2d at 808–09, ¶¶ 41–42, 812, ¶ 51 (Congress intended no particular standard and thus clear and convincing applies). *But see E.A. v. State Div. of Family Youth Serv.*, 46 P.3d 986, 989–90 (Alaska 2002) (applying preponderance of the evidence standard to "active efforts").

*County Juvenile Action No. JS–8287*, 171 Ariz. 104, 113, 828 P.2d 1245, 1254 (App.1991), that "active efforts" have to be proven beyond a reasonable doubt. The opinion cited no Arizona authority and relied solely on the South Dakota case of *People in Interest of P.B.*, 371 N.W.2d 366, 372 (S.D.1985). Although the South Dakota Supreme Court had assumed without analysis that the same burden of proof applies to both ICWA findings, *People in Interest of S.R.*, 323 N.W.2d 885, 887 (S.D.1982), we disagree with that conclusion.

¶ 25 When interpreting either statutes or procedural rules, courts generally are reluctant to expand their scope or to imply requirements that have not been made explicit. *See, e.g., Dean v. United States*, 556 U.S. 568, 129 S.Ct. 1849, 1853, 173 L.Ed.2d 785 (2009); *In re MH 2004–001987*, 211 Ariz. 255, 258, ¶ 14, 120 P.3d 210, 213 (App.2005) (declining to imply provision not found in statute's language). Here, Congress plainly intended for the most stringent standard of proof to apply to a finding that a parent's continued custody was "likely to result in serious emotional or physical damage to the child." With equal clarity, Congress chose not to specify a standard of proof applicable to the "active efforts" requirement when it easily could have done so. Thus, we conclude that Congress intended to allow each state the power to choose the standard by which its courts would determine whether "active efforts" had been made to prevent the family breakup.

¶ 26 ADES suggests that the preponderance of the evidence standard could be sufficient for a finding of "active efforts." But other than applying the preponderance of the evidence standard to the finding that termination is in the child's best interests, the Arizona legislature has required that any statutory ground for termination be found by clear and convincing evidence. Thus, our legislature appears to have favored the use of the higher standard of proof. We therefore hold that the necessary ICWA "active efforts" finding must also be made under the clear and convincing evidence standard.[14] To apply the lesser preponderance standard, as ADES suggests, would subject a federally mandated finding to a less compelling form of proof than is otherwise required by Arizona law. This we decline to do.[15]

14. Even if the preponderance standard were to apply to the ICWA "active efforts" requirement, we still would affirm the trial court's ruling because it was based on the higher clear and convincing evidence standard.

15. ADES also urges us to find that the "active efforts" required by ICWA are equivalent to the "diligent efforts" mandated by A.R.S. § 8–533(B)(11), which provides that to terminate parental rights, the court must find that "[t]he agency responsible for the care of the child made diligent efforts to provide appropriate reunifica-

### Evidence of Active Efforts

¶ 27 Mother next claims that the court erred in finding that ADES had made "active efforts" to prevent the breakup of her family. In reviewing a severance order, we accept the superior court's factual findings unless they are clearly erroneous, i.e., unless they are not supported by reasonable evidence. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 2, 982 P.2d 1290, 1291 (App.1998). We also view the evidence "in the light most favorable to" upholding the court's judgment. *In re Maricopa County Juv. Action No. JD–5312*, 178 Ariz. 372, 376, 873 P.2d 710, 714 (App.1994). Furthermore, appellate courts do not reweigh the evidence concerning the diligence exerted in attempting to preserve the family. *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 81, ¶ 13, 107 P.3d 923, 927 (App.2005). "[W]e look only to determine whether there was substantial evidence" to sustain the court's findings. *Id.*

¶ 28 Mother first implies that ADES' shortcomings include its refusal to pay for her services, but the record reflects that the only service not paid for by the State was David M.'s domestic violence counseling, rather than Mother's services. Mother also asserts that ADES' own witnesses, including a caseworker, testified that ADES had not made active efforts to preserve the family. Although the court may give some weight to a caseworker's opinion, whether "active efforts" were made and were unsuccessful requires both factual findings by the court about the nature and extent of the services provided and a legal conclusion about their adequacy.[16] In any event, the record belies Mother's claim.

¶ 29 Shanna Stewart, Mother's case manager from October 2008 until February 2010, testified that ADES could not pay for David M.'s domestic violence counseling because he was not a United States citizen. The Nation's attorney then asked whether Stewart had helped David M. place calls to various agencies. Stewart did not recall but said that she had told David M. to call her if he had difficulty in arranging the counseling. Counsel then asked Stewart whether she "consider[ed] waiting around for a parent to call you to be making active efforts to reunify a family?" Stewart said that she did not. However, those questions and answers did not constitute Stewart's assessment of ADES' reunification efforts. To the contrary, she also testified that in each report she had filed with the court, she had asked the court to find that "active [reunification] efforts" had been made because she believed such to be true.

¶ 30 A subsequent case manager, Stacy Lindner, testified that she had been assigned to this case for two months by the time of trial and that ADES *had* made active efforts to provide reunification services. On cross-examination, however, Lindner opined that ADES *had not* made "active efforts" apparently because she thought Stewart had not done more than suggest to Mother that she seek domestic violence counseling. Mother herself testified, however, that Stewart had arranged for Mother's domestic violence counseling and that AHCCCS was paying for it. Thus, Lindner's opinion about lack of "active efforts" was both equivocal and likely based upon her misunderstanding of the case history.

¶ 31 Mother nevertheless asserts that the court should have dismissed the severance motion based upon the expert opinions of the case managers. She argues that in light of their testimony, the court could not have found by clear and convincing evidence that ADES had made "active efforts."

¶ 32 As we have discussed, however, only one case manager expressed doubt about "active efforts." More importantly, ICWA does not mandate use of expert testimony to support the court's finding of "active efforts." It is only when considering possible harm to the children that the court must find "by evi-

---

tion services." But in light of the finding that clear and convincing evidence showed ADES had made active efforts to prevent the family breakup, we need not decide whether active efforts are greater than "diligent efforts."

16. *See, e.g., In re K.B.*, 173 Cal.App.4th 1275, 93 Cal.Rptr.3d 751, 762 (2009) (finding of active efforts is "mixed question of law and fact," and whether services provided constitute active efforts is question of law).

dence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody ... by a parent or Indian custodian is likely to result in serious emotional or physical damage." 25 U.S.C. § 1912(f). Here, the court properly relied upon the expert testimony of two case managers in finding the children were at risk of harm, but the basis of its "active efforts" finding was not similarly constrained.

¶ 33 Mother next argues that although she successfully completed many services, ADES failed to provide either individual or domestic violence counseling and thus failed to make "active efforts" to preserve her family. But as noted above, Mother participated in domestic violence counseling from October 2009 until trial the following May. She also had been referred to AmeriPsych for bonding therapy with L.L. but twice failed to appear for intake and did not respond to follow-up calls from the agency. In his psychological evaluation, Dr. Thal stated that "individual counseling may be helpful." It does not appear that Mother ever received such counseling, but the record does not reveal why.

¶ 34 Nonetheless, neither ICWA nor Arizona law mandates that ADES provide every imaginable service or program designed to prevent the breakup of the Indian family before the court may find that "active efforts" took place.[17] *Maricopa County Juv. Action No. JS–501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App.1994). Furthermore,

ADES cannot force a parent to participate in recommended services. It must, of course, provide parents with the necessary "time and opportunity to participate in programs designed to help [them] become" effective parents. *Id.* In gauging "active efforts" here, much of the evidence centered upon what services were needed, when CPS arranged for them, and the extent of Mother's participation during the two years the children were in foster care.[18]

¶ 35 The superior court recited at great length the evidentiary bases for its conclusion that clear and convincing evidence demonstrated that ADES had made active efforts at reunification but that those efforts proved unsuccessful. We conclude that the evidence is more than sufficient to support the court's judgment.

## Placement with Non–Family Member

■ ¶ 36 ICWA provides that with respect to adoptive placements "of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a).[19] The superior court found good cause to deviate from this requirement and to keep the children with foster families that wished to adopt them.

---

17. In interpreting "active efforts," some courts have contrasted "active" with its antonym "passive" and concluded that "active efforts" demand "more than merely draw[ing] up a reunification plan and leav[ing] the [parent] to use [his or her] own resources to bring it to fruition." *In re K.B.*, 173 Cal.App.4th 1275, 93 Cal.Rptr.3d 751, 763 (2009); *A.A. v. State Dep't of Family Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) ("active efforts" requires helping parent acquire skills needed to retain custody of child, not just drawing up plan). In a dependency case in Arizona, each report to the juvenile court from a CPS caseworker must "[l]ist and describe [the] services provided to prevent removal and [the] outcome of services," identify the "[t]ypes of services needed to facilitate reunification and [the] dates that such services were requested and will begin," and list any services that a parent requested and if not provided, a reason why not. In Arizona, a mere plan for reunification is not enough even in a non-ICWA case.

18. In addition to arguing that ADES did not do enough to assist in reunifying her family, Mother asserts that ADES required her to complete more and more services and thereby extended the time her children were in foster care to her disadvantage. But Mother does not support her argument with specific examples or evidence. We note, however, that when ADES offered additional services such as a bonding assessment and therapy, Mother did not object to them and that some services were delayed or interrupted by Mother's incarceration, for which ADES was not responsible.

19. ICWA allows for deviation from its placement preferences of "good cause" regardless of whether the child's placement is pre-adoptive or adoptive. 25 U.S.C. § 1915(a),(b).

¶ 37 Mother argues that the children should have been placed with her half-sister, N. Mother asserts that the Nation established that N. "was interested in being the [children's] guardian." Dorcus Segundo, a social worker for the Nation, testified that the foster care placements were not "in accord" with ICWA and that the Nation "struggled" with whether they were acceptable. Segundo also said that the Nation would prefer a guardianship but that it neither opposed nor supported severance and adoption. She added, however, that N. was *uncertain* of her willingness to be a guardian and had told Segundo that she would only take E.L. and did not want to adopt any of the children. Therefore, the Nation did not support N. as a placement. The only other familial placement option Mother suggested had been rejected because of a prior history with CPS and inability to pass the criminal background check.[20]

¶ 38 After investigating N. as a placement, CPS initially recommended that the children be placed with her. However, Dr. Moe reported his concern that N. planned to return the children to Mother at such time that Mother had a job and a residence of her own. Dr. Moe also doubted N.'s statement that although she is Hispanic, she had kept in touch with her Native American relatives because other evidence seemed to contradict that statement. Furthermore, after the CPS investigation, N. lost her job and had found replacement work for only five hours a week, and N. was living in a two-bedroom home with two of her own children. Finally, Dr. Moe expressed concern that N. said that she had seen L.L. before she came into care but had not noticed L.L.'s malnourished state or bruises; he therefore doubted whether she could adequately assess the children's condition and Mother's ability to assume their care. Dr. Moe recommended that all three children remain with their foster parents, although he did not rule out a permanent guardianship rather than adoption for E.L.

The superior court, therefore, acted within its discretion by ordering that the children remain in their existing placements.

## CONCLUSION

¶ 39 The court did not err in finding by clear and convincing evidence that ADES had made the required "active efforts" to reunify Mother with the children and that those efforts were unsuccessful. It similarly did not err in finding that good cause existed to deviate from ICWA's placement preferences. We affirm the judgment severing Mother's parental rights to E.L., L.L., and D.L.

CONCURRING: DONN KESSLER, Presiding Judge, and DIANE M. JOHNSEN, Judge.

---

**20.** Although the Nation agrees that good cause existed for the court's placement ruling, it suggests that we ignore ADES' position that the extent of the children's bonding with their foster families is a legitimate factor supporting deviation from the ICWA preferences. The Nation asserts that its support of the children's present placements was all the superior court needed to consider. But because the court's order does not mention bonding in finding good cause to deviate from the ICWA preferences, we need not resolve the relevance of bonding.