NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

VANESSA T.,
*Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY,
B.T., R.T., M.T.,
*Appellees.*

No. 1 CA-JV 16-0190
FILED 2-16-2017

---

Appeal from the Superior Court in Apache County
No.  S0100JD201400010
The Honorable C. Allan Perkins, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Law Office of Bryce M. Hamblin, PLC, Eagar
By Bryce M. Hamblin
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee DCS*

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Margaret H. Downie and Judge James P. Beene joined.

**J O H N S E N**, Judge:

**¶1**        Vanessa T. ("Mother") appeals from the superior court's order severing her parental rights to B.T., R.T. and M.T.  For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**        B.T. was born in May 2008 and R.T. in January 2010.  The statutory predecessor to the Department of Child Safety ("DCS") first was called to the family home in July 2011 after Desi-Lee T. ("Father"), angry at something B.T. had done, shoved him into a wall, causing the child to drop to the floor.[1]  At that time, the agency initiated a case plan that allowed B.T. and R.T. to remain with Mother and Father while the parents completed the services required under the plan.  But in October 2011, Father hit B.T. and R.T., leaving bruises on B.T.'s head and R.T.'s back.  Two months later, the agency removed B.T. and R.T.; according to the agency, Mother and Father not only failed to comply with the provided services, their home was "filthy."  The superior court found B.T. and R.T. dependent as to Mother and Father in January 2012.

**¶3**        In October 2013, B.T. and R.T. were returned to Mother and Father after each parent completed parenting classes.  A month later, M.T. was born.

**¶4**        In June 2014, however, violence resumed in the family home.  The DCS case manager received a report on June 13, 2014 concerning Mother's Facebook posts.  Per the report, on May 1, 2014, Mother posted, "[W]hat a lonely night I am having got into a fight with kids dad he called me a no good bitch."  Then, on June 8, 2014, Mother posted, "I can't take this

---

[1]        Pursuant to S.B. 1001, Section 157, 51st Leg., 2d Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety ("DCS") is substituted for the Arizona Department of Economic Security in this matter.  *See* ARCAP 27.

anymore someone please do something to my husband if he keeps hitting the kids and hurting them in ways he can't imagine."

**¶5** On the morning of June 14, 2014, the case manager received an emergency report that Father had physically abused B.T. While B.T. and R.T. were playing with their new puppy, the dog fell off the bed. Upon hearing the puppy's cry, Father entered the bedroom "yelling and cussing;" he then grabbed B.T. by the arms and smacked him in the face with an open hand. Meanwhile, Mother remained in the living room. Later she admitted that soon after she heard Father enter the bedroom, she heard B.T. scream. But, as she later told the case manager, she was unable to protect B.T. because she was "tending to the puppy and could not tend to both at the same time." Minutes later, B.T. emerged from the bedroom with thumbprint-sized bruises on his arms, scratches and bruises on his back and a bloody nose.

**¶6** The same morning, Mother and B.T. went to the police, sidestepping Father as he attempted to keep them from leaving the home. Father was arrested and taken to jail. When Mother was asked what she and the children would do after Father was released, Mother suggested B.T. and R.T. stay on the reservation in Kayenta with their grandmother, while Mother, Father and M.T. remain at the family home. DCS took B.T., R.T. and M.T. into physical custody, and the superior court found the children dependent as to Mother and Father on August 12, 2014.

**¶7** Before reunification could take place, DCS required Mother to show she could and would parent her children in an age-appropriate manner, protect them from harm and maintain her sobriety. To help Mother reach those goals, DCS provided the following services: Visitation, a psychological evaluation, individual counseling, four rounds of parent-aide services, a substance abuse assessment, random drug testing, one-on-one parenting skills classes and transportation as needed. Additionally, because Mother believed that Father would harm the children if they were returned—indeed, even a year after the children were removed from the home, both Mother and Father stated the children would not be safe in their care—DCS informed Mother that it could not return the children to her so long as she remained with Father and the children remained unsafe in his care.

**¶8** To help Mother leave Father, DCS offered to call anyone Mother thought could support her, including a domestic violence hotline, which Mother knew could have provided her with housing and financial assistance, but Mother refused the offer. On a separate occasion, a DCS

parent aide stressed to Mother that she needed to call police if Father became angry, and offered to call a "safe house" for Mother, where she could stay and get help. Still, even though Mother recognized domestic violence was an issue in the home and admitted she knew that Father would hurt the children again, Mother remained with Father.

¶9 DCS moved to sever Mother and Father's parental rights in October 2015. The trial took place in April 2016. After hearing the evidence, the superior court terminated Mother's parental rights on grounds of neglect and failure to protect from willful abuse under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(2) (2017) and 15 months' time-in-care under A.R.S. § 8-533(B)(8)(c).[2] Mother timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, A.R.S. § 8-235(A) (2017) and Arizona Rule of Procedure for the Juvenile Court 103(A).

## DISCUSSION

¶10 The right to custody of one's child is fundamental but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The superior court may terminate a parent-child relationship upon clear and convincing evidence of at least one of the statutory grounds set out in A.R.S. § 8-533(B). *Michael J.*, 196 Ariz. at 249, ¶ 12.

¶11 Because each child is an Indian child, these proceedings are subject to the Indian Child Welfare Act of 1978 ("ICWA"). Under ICWA, any party seeking to terminate parental rights to an Indian child under state law must satisfy the court, by clear and convincing evidence, that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2012); *accord* Ariz. R.P. Juv. Ct. 66(C); *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 421, ¶ 26 (App. 2011). Under the law, the parent need not be provided with every imaginable service or program designed to prevent the breakup of the Indian family before the court may find that "active efforts" took place. *Maricopa County Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). Furthermore, a petitioner is not required to "force a parent to participate in recommended services." *Yvonne L.*, 227 Ariz. at 423, ¶ 34. Rather, parents

---

[2] Absent material revision after the relevant date, we cite a statute's current version. Father's parental rights were terminated on grounds of willful abuse under A.R.S. § 8-533(B)(2) and 15 months' time-in-care under § 8-533(B)(8)(c). Father is not a party to this appeal.

must be provided with the necessary "time and opportunity to participate in programs designed to help [them] become" effective parents. *JS-501904*, 180 Ariz. at 353.

**¶12** We review a termination order for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). Because the superior court is in the best position to "weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings," we will accept its findings of fact unless no reasonable evidence supports them. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶13** Mother argues DCS failed to make active efforts to provide remedial services and rehabilitative programs because, as Mother alleges, DCS did not provide her treatment for a personality disorder.

**¶14** Contrary to Mother's arguments, reasonable evidence supports the superior court's findings that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. In January 2015, Dr. Carlos Vega performed a psychological evaluation of Mother. At that time, Dr. Vega diagnosed Mother with a personality disorder and recommended psychotherapy as treatment. Although Mother argues she never received the recommended treatment, Devon Pinkard, Mother's mental health counselor, testified that Mother was referred to a psychotherapist and offered medication, but she refused the services.

**¶15** Similarly, Mother argues DCS failed to make active efforts to help her leave Father. But, as Mother admits on appeal, the court heard testimony that DCS gave Mother the phone number of a domestic violence hotline that could have provided Mother with housing and financial assistance, and even offered to call the hotline for her. DCS also offered to call a "safe house" for Mother so she could have shelter if she chose to leave Father. Each time DCS offered these services, however, Mother chose instead to stay with Father. In fact, she chose to stay with Father knowing that DCS had told her that it could not return the children to her as long as she remained with Father. Based on this record, sufficient evidence supported the superior court's finding that DCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.

## CONCLUSION

**¶16** For the foregoing reasons, we affirm the superior court's order severing Mother's parental rights to B.T., R.T. and M.T.



AMY M. WOOD • Clerk of the Court
FILED:  AA