NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

AUGUSTINE D., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.D., TOHONO O'ODHAM
NATION, *Appellees*.

No. 1 CA-JV 21-0295
FILED 3-17-2022

Appeal from the Superior Court in Maricopa County
No. JD36853
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

COUNSEL

John L. Popilek PC, Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

Law Office of Justin Fernstrom, Mesa
By Justin Fernstrom
*Counsel for Appellee Tohono O'odham Nation*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge James B. Morse Jr. joined.

---

**H O W E**, Judge:

¶1 Augustine D. ("Father") appeals the juvenile court's order terminating his parental rights to A.D., born April 2020. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2 We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). A.D. is an Indian child under the Indian Child Welfare Act ("ICWA"). *See* 25 U.S.C. § 1903(4) (defining "Indian child"). Father and Syndi V. ("Mother") were never married and have three children in common; Mother has a fourth child from a different father. Father signed an acknowledgment of paternity for A.D. The parents are enrolled members of the Tohono O'odham Nation, and A.D. is eligible for enrollment.

¶3 The Department of Child Safety had been involved since 2018 after Mother gave birth to a child exposed to methamphetamine and marijuana. As a result, the Department removed the children from the home. At a team decision-making meeting, Father asked the Department whether he could be a responsible adult of the children, but he tested positive for methamphetamine in a rule-out drug test despite denying any substance abuse. The Department offered the parents family preservation services, parent-aide sessions, substance-abuse testing through Physician Services Inc. ("PSI") and TASC Inc., substance-abuse treatment through TERROS, transportation services, attempts to communicate with the Nation, and visitation with the children. The parents were repeatedly reminded of their testing appointments, but Mother barely engaged, and Father did not engage at all. Because of their lack of participation, the referral at TERROS and the parent-aide service were closed unsuccessfully. Both parents continually denied substance abuse and cited distance as a barrier to their engagement in drug testing.

¶4          To address this barrier, the Department sought the Nation's advice and opinion. The Department and a tribal specialist arranged to meet with the parents to a create a service plan. Specifically, the plan included substance-abuse treatment at San Lucy Tribal Center, which was affiliated with the Nation and closer to the parents' home. The parents were also offered scheduled drug testing through PSI or TASC three days per week. Creating such a structured testing plan is not standard practice but "used in only the most extreme circumstances." Even though the parents knew which days they would be testing and were repeatedly reminded of their appointments, they failed to show up.

¶5          In 2020, during the dependency of the other children, A.D. was born substance exposed, removed from the home, and placed with a relative, also a member of the Nation. Around this time, Father tested positive again for methamphetamine. He maintained, however, that someone had tampered with the test and refused to engage in services. The Department then offered supervised visitation services for several months, but parents failed to make contact and the Department closed the service. The Department later petitioned to have A.D. found dependent as to both parents based on neglect from their history of substance abuse. A few months after A.D.'s birth, the court found that he was dependent as to both parents, and the case plan was set for family reunification.

¶6          During this time, the Department maintained contact with the Nation. Visitation service began again, and the parents were assigned a case aide to facilitate visitation. The Department again referred the parents for substance-abuse treatment at TERROS and Arizona Families F.I.R.S.T., substance testing through Averhealth, PSI, and TASC, and transportation services through three companies that later closed because of "excessive missed trips." Mother participated sporadically in Averhealth, and Father failed to test. The Department also recommended that he engage in parenting classes in his community. He did not maintain communication with the Department, and the Department had trouble contacting him. He claimed that his busy job prevented his engagement in services. When asked about his employment documentation, Father stated that he did not have to provide that information. Both parents continued to resist engaging in services, but Mother continued inconsistent engagement in substance-abuse treatment at San Lucy Tribal Center. The parents claimed that they missed testing because of a lack of transportation. Nevertheless, they used transportation services for visits.

¶7          By March 2021, the case plan changed to severance and adoption, and the Department moved to terminate the parent-child

relationship of both parents. The court held a termination hearing, and the parents contested the termination. Father testified that his busy work schedule, lack of transportation, lack of communication with the Nation and the Department, and the Covid-19 pandemic all caused his failure to participate in services. He also testified that he had to work "eight months straight without a day off." He noted, however, that he had started services at San Lucy Tribal Center.

¶8            A Department child safety specialist testified that the Department attempted to contact the parents by mailing service letters, calling, sending text messages, and visiting the home to discuss the case. She also testified that because issues arose with the parents' transportation, the Department deviated from its standard practice and arranged an open-cab referral that followed the parents' schedule to ensure that they attended services and visitation. She also testified that the Department provided all the required services and attempted to communicate with the Nation in implementing services for the family. She noted that although in-home visitation is better than visitation in the community, Mother's use of methamphetamine created a safety concern that prevented visits from taking place at home. She also testified that the Department did not provide a parent-aide service after A.D.'s birth because the Department prematurely closed the previous parent-aide service for the other children for lack of participation. She explained that before recommending a new parent-aide, the parents needed to demonstrate "consistency and engagement" in services.

¶9            The tribal case manager testified that she believed active efforts were made to prevent the breakup of the family but that those efforts were unsuccessful. She noted that the parents never requested additional services, but she met with them twice to discuss their services and encourage them to participate. She added that if they had complied, more services might have been recommended. She acknowledged, however, that tribal programs were shut down because of the Covid-19 pandemic but that some services were available virtually. The parents also could have engaged in services off the reservation.

¶10           The court terminated Father's and Mother's parental rights to A.D. based on six and nine months' time-in-care and chronic substance-abuse grounds. The court found that termination was in A.D.'s best interests and that continued custody of the parents would likely result in "serious emotional or physical damage" to A.D. The court also found

that the Department made active efforts to prevent the breakup of the Indian family under ICWA. Father and Mother timely appealed.[1]

**DISCUSSION**

**¶11**        Father argues that the State did not prove by clear and convincing evidence that the Department made active efforts to prevent the breakup of the family under ICWA. A juvenile court's termination determination is reviewed for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). Because the juvenile court is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts, *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004), we will affirm a termination decision unless no reasonable evidence supports it, *Xavier R. v. Joseph R.*, 230 Ariz. 96, 100 ¶ 11 (App. 2012).

**¶12**        To terminate parental rights, the juvenile court must find the existence of at least one statutory ground under A.R.S. § 8–533 by clear and convincing evidence and must find that termination is in the child's best interests by a preponderance of the evidence. A.R.S. § 8–537(B); Ariz. R.P. Juv. Ct. 66(C); *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). ICWA applies when an Indian child is the subject of a termination. *See Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 416–17 (App. 2011). Before terminating parental rights under ICWA, the Department must (1) prove beyond a reasonable doubt that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," Ariz. R.P. Juv. Ct. 66(C); 25 U.S.C. § 1912(f), and (2) prove by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts have proven unsuccessful," 25 U.S.C. § 1912(d); *Yvonne L.*, 227 Ariz. at 421 (holding that the standard for proving active efforts is "clear and convincing").

**¶13**        "Active efforts" means "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. The parents must be assisted "through the steps of a case plan and with accessing or developing the

---

[1]        Mother's counsel filed an affidavit pursuant to Arizona Rule of Procedure for the Juvenile Court 106(G) attesting that after reviewing the entire record on appeal, he found no non-frivolous issues to raise. Thus, even though she filed a notice of appeal, she never filed an opening brief.

resources necessary to satisfy the case plan." *Id.* Active efforts "should be conducted in partnership with the Indian child and the Indian child's parents . . . and Tribe." *Id.* They should be "tailored to the facts and circumstances of the case." *Id.* Although "active efforts" can be contrasted with "passive efforts," they require more than a mere reunification plan. *Yvonne L.*, 227 Ariz. at 423 ¶ 34 n.17. But "neither ICWA nor Arizona law mandates that [the Department] provide every imaginable service or program designed to prevent the breakup of the Indian family before the court may find that 'active efforts' took place." *Id.* at ¶ 34. Further, the Department cannot force parents to engage in services but must provide them with the "necessary 'time and opportunity to participate in programs designed to help [them] become' effective parents." *Id.* (quoting *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (finding that active efforts were centered on the mother's needed services, when the Department arranged the services, and the extent that she participated in services).

¶14 Relevant examples of active efforts include (1) identifying appropriate services and actively assisting parents to obtain those services; (2) inviting representatives of the child's Tribe to provide the family with support and services; (3) implementing "all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe"; (4) supporting visitation with parents "in the most natural setting possible"; (5) identifying community resources and assisting the parents in accessing them; (6) "[m]onitoring progress and participation in services"; and (7) considering alternative methods of addressing the parents' needs where services are not available. 25 C.F.R. § 23.2.

¶15 Father only challenges the juvenile court's active efforts finding. The Department argues that Father waived his right to challenge this issue on appeal because he did not raise it before the juvenile court. The Department also argues that even without considering waiver, evidence supports the juvenile court's finding of active efforts. We need not reach the issue of waiver because reasonable evidence shows that the Department made affirmative, active, thorough, and timely efforts to provide remedial services and rehabilitative programs to prevent the breakup of the family. The record demonstrates that the Department offered family preservation services, case management services, substance-abuse testing and treatment, visitation services, transportation services, and foster care. A.D. was placed with a family member, who was also a member of the Nation, to help him preserve his Native American culture. The Department also offered tribal services after the parents expressed their wish to participate in

on-reservation services. The Department actively attempted to communicate with the parents through phone calls, text messages, email, in-person meetings, and service letters. The Nation was also actively involved in those efforts. The tribal case manager testified that active efforts had been made to preserve the family.

¶16 While Father argues that the Department should have been more accommodating to his busy work schedule, the record demonstrated otherwise. First, when the Department asked for documentation about his employment, he refused to provide the information. The Department could have used the information to contact his employer to work through an appropriate schedule. Second, the Department and tribal case manager met with the parents to create a new service plan to fit their schedule and to advise them of their responsibilities. They attempted to accommodate services to the parents' needs, including providing scheduled drug testing three times per week, rather than the typical practice of random testing, and providing substance-abuse treatment closer to their home. The parents knew in advance when their testing would occur, and transportation was also provided. Third, evidence shows that Father chose not to engage in services. He did not maintain contact with the Department, insisted that his previous positive test results were tampered with, and believed that he was not at fault for the Department's involvement. He did, however, attend visits.

¶17 Father also argues that the Covid-19 pandemic prevented him from engaging in services and that active efforts required the Department to wait for tribal programs to reopen before seeking termination of parental rights. The tribal case manager testified that the parents could have participated virtually or through off-reservation facilities. They had an open-cab referral, which would have facilitated the drive to off-reservation services. Further, Mother participated in some services during the pandemic. Father also argues that the Department did not provide enough visitation or a parent aide. He adds that visitation should have occurred in Mother's home. But the parents were offered visitation right after A.D. was taken into the Department's care. They failed, however, to contact the supervised-visitation provider in the first few months of the dependency, and this service closed. They were later offered visitation again. Also, the Department child safety specialist testified that the parents' previous parent-aide closed because of their lack of participation and that they would have been offered another parent-aide only upon "consistency and engagement" in services. She added that visitation could not take place at Mother's home because her substance abuse created an unsafe environment.

¶18      The record demonstrates that the parents had time and opportunity, even before A.D. was born, to participate in services. They failed to do so. The Department could not force the parents to engage in services. Father argues that the "active efforts" standard under ICWA is higher than the "reasonable efforts" standard under non-ICWA termination cases. Regardless of the standard, reasonable evidence supports the juvenile court's finding that the Department provided active efforts to prevent the breakup of the family, even though these efforts proved unsuccessful.

## CONCLUSION

¶19      For the foregoing reasons, we affirm.

