NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MICHAEL C., TYANA T., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, D.C., N.C., M.C., E.C., R.C.,
GREENVILLE RANCHERIA, *Appellees.*

No. 1 CA-JV 20-0302
FILED 4-29-2021

Appeal from the Superior Court in Mohave County
No. B8015JD201904031
The Honorable Rick A. Williams, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Michael C.*

The Law Offices of Michael and Casey, Phoenix
By Robert Ian Casey
*Counsel for Appellant Tyana T.*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

Peebles Kidder Bergin & Robinson LLP, Sacramento, California
By Gregory M. Narvaez (Pro Hac Vice)
*Counsel for Appellee Greenville Rancheria*

_____

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Randall M. Howe joined.

_____

**C R U Z**, Judge:

¶1        Michael C. ("Father") and Tyana T. ("Mother") appeal from the superior court's order terminating their parental rights to D.C., N.C., M.C., E.C., and R.C. ("the children").  Because the children are members of the Greenville Rancheria Tribe ("the Tribe"), these termination proceedings are subject to the Indian Child Welfare Act ("ICWA"), 25 United States Code ("U.S.C.") sections 1901 to -1963.  For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        In March 2019, DCS received a report that Father had pushed and hit Mother in front of the children.  D.C., who was fourteen years old, attempted to intervene.  Father grabbed D.C. by the neck and pushed him into a counter, scratching his neck.  The other children were scared and hid in the home.  Before this incident, police had responded to Mother and Father's home at least six times for reports of domestic violence.

¶3        Police arrested Father and advised Mother on how to obtain an order of protection.  She did not do so.  Father pleaded guilty to three counts of disturbing the peace, all domestic violence offenses.  The factual basis for Father's plea stated, "On March 26, 2019 . . . [Father] knowingly disturbed the peace of his family . . . .  [He] engaged in seriously disruptive behavior when he began to yell, scream, and fight with [Mother], son D.C., and daughter N.C.  The above incident is domestic violence because all three victims are members of [Father's] immediate family."

2

¶4          When Father was released from jail, DCS put a safety plan into place. Father's mother ("Grandmother") was to supervise all contact between Father, Mother, and the children. DCS required Father to live with Grandmother until the family engaged in services and addressed the domestic violence issue.

¶5          Mother and the children were enrolled members of the Tribe, which is located in California. DCS contacted the Tribe, and the Tribe's ICWA worker participated in DCS's team decision meeting and agreed that the services offered to the family were appropriate and necessary. DCS learned that Mother and Father had been evicted from tribal housing in the past because of domestic violence and that Father was no longer welcome to reside within tribal jurisdiction for the same reason. DCS also learned that between 2005 and 2017, when Mother and Father lived in California, California Child Protective Services received eight reports (deemed unsubstantiated) about the family, including reports of neglect, abuse, domestic violence, and drug use.

¶6          In May 2019, DCS received a second report about the family. One of the children disclosed at school that Father and Mother fought all the time, and that Father hit all of the children except for the youngest children, E.C. and R.C. DCS investigated and discovered that Father had been living at home with Mother's consent in violation of the safety plan, domestic violence was occurring daily, and Mother and Father had been arrested for shoplifting at Walmart. Further, Mother and Father had not engaged in in-home services and Grandmother had not followed the safety plan. Mother told DCS that the domestic violence between herself and Father was "not that bad." Father denied living in the home or that ongoing domestic violence had occurred. DCS asked Mother and Father to submit hair follicles and urinalysis tests but they did not do so. Mother eventually submitted to a hair follicle test that came back positive for marijuana and Father eventually submitted a urinalysis test that was also positive for marijuana.

¶7          DCS removed the children from the home and filed a dependency petition. At the time of the removal, some of the children were bruised and "were found to be fearful in the home." M.C. had lice and severe dental decay that required extensive dental work. D.C. had sixteen cavities that needed filling. M.C. was diagnosed with anxiety and N.C. was diagnosed with anxiety and depression.

¶8          DCS offered Mother and Father additional services, including case management services, substance abuse services, urinalysis testing,

mental health services, domestic violence, anger management, and parenting classes, supervised visitation, childcare services, parent aide services, tribal resources, and transportation. In June 2019, the superior court found the children were dependent. In December 2019, seven-year-old M.C. moved to suspend her visitation with Mother and Father because visitation "would endanger seriously [her] physical, mental, moral or emotional health." The superior court granted the motion, finding that visitation would endanger M.C.

¶9        Mother's and Father's participation in services was inconsistent. They failed to participate in substance abuse services and testing and missed a majority of their visitations with the children until the case plan was changed to termination and adoption. When Mother and Father missed visits with the children they seldom called. Mother and Father both failed to complete domestic violence classes or counseling. Mother and Father both completed parenting classes before the last day of the termination adjudication hearing.

¶10        DCS moved to terminate Mother's and Father's parental rights to D.C., N.C., and M.C. pursuant to Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(a) (nine months' out-of-home placement) and A.R.S. § 8-533(B)(2) (neglect or failure to protect from neglect), and to E.C. and R.C. pursuant to A.R.S. § 8-533(B)(8)(b) (six months' out-of-home placement of a child under the age of 3) and A.R.S. § 8-533(B)(2).

¶11        At the termination adjudication hearing, Mother testified that "[d]omestic violence has never been an issue in [her] relationship" with Father. She testified she was not currently using marijuana, but then admitted having used marijuana 2.5 weeks before the first day of the termination adjudication hearing. In its closing argument, the Tribe's attorney indicated the Tribe agreed with DCS's termination motion:

> While the normal circumstance is the Tribe would have encouraged reunification and did early-on . . . rather than terminating rights, it's the parents lack of progress here and noncompliance, and the Tribe's belief that [DCS] has made active efforts here. The Tribe['s] support of [DCS]'s proposed termination . . . stems primarily from the Tribe's very strong belief that the children deserve to be in stable, healthy homes.

¶12        In September 2020, the superior court terminated Mother's and Father's parental rights on the grounds alleged in the motion. The court found that under ICWA, DCS made active efforts to provide remedial

services and rehabilitative programs designed to prevent the breakup of the family, those efforts were unsuccessful, and further, continued custody of the children by Mother and Father would likely result in serious emotional or physical damage to the children. *See* 25 U.S.C. § 1912(d), (f).

¶13 Mother and Father timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

I. Active Efforts

¶14 On appeal, Mother and Father both argue the superior court erred by finding that DCS made active efforts to provide services and programs designed to prevent the breakup of the family.

¶15 Under Arizona law, before the superior court may terminate parental rights it must find that the moving party has proven one or more of the statutory grounds for termination by clear and convincing evidence. A.R.S. § 8-537(B). The court must also find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). When an Indian child is the subject of a termination petition, ICWA applies and the court must also find (1) "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and [those] efforts have proved unsuccessful," and (2) "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(d), (f).

¶16 DCS must prove that it has made "active efforts" to prevent the breakup of an Indian family by clear and convincing evidence. *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 421, ¶ 26 (App. 2011). We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the superior court's termination order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). We will not reverse the superior court's order unless reasonable evidence does not support the superior court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

¶17 "Active efforts" are "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 Code of Fed. Reg. § 23.2. When an agency such as DCS is

involved in an ICWA proceeding, "active efforts must involve assisting the . . . parents . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." *Id.* Active efforts should be tailored to the facts and circumstances of the case. *Id.* "[N]either ICWA nor Arizona law mandates that [DCS] provide every imaginable service or program designed to prevent the breakup of the Indian family before the court may find that 'active efforts' took place." *Yvonne L.*, 227 Ariz. at 423, ¶ 34. Nor can it "force a parent to participate in recommended services," but it must "provide parents with the necessary time and opportunity to participate in programs designed to help [them] become effective parents." *Id.* (citation and internal quotation marks omitted).

¶18 The record shows that DCS offered Mother and Father case management services, substance abuse services, urinalysis testing, mental health services, domestic violence, anger management, and parenting classes, supervised visitation, childcare services, parent aide services, tribal resources, and transportation. DCS involved the Tribe in team decision meetings and used it to find tribal placements for the children. Kasaundra Gooden, DCS's ICWA expert, testified that DCS had made active efforts to prevent the breakup of the Indian family but those efforts had been unsuccessful. The Tribe indicated it also believed DCS had made active rehabilitative efforts in this case.

¶19 The superior court recited at length the evidence supporting its conclusion that clear and convincing evidence demonstrated that DCS had made active reunification efforts but that those efforts proved unsuccessful. Sufficient evidence supported that determination.

II. Out-of-Home Placement

¶20 Father also argues the superior court erred by terminating his parental rights pursuant to A.R.S. § 8-533(B)(8)(a), (b) because there was insufficient evidence that he substantially neglected or willfully refused to remedy the circumstances that caused the children to be in out-of-home placements. We disagree.

¶21 Here, the children had been in out-of-home placements for nearly fourteen months at the start of the termination adjudication hearing and for more than fifteen months when the superior court terminated Father's parental rights. Father acknowledges that the record reflects he "did not engage in substance abuse services, failed to complete services and had not provided documentation regarding his services," but still argues

he did not substantially neglect to remedy the circumstances causing the children to remain in out-of-home placements because he had participated in mental health services, visitation, and parenting classes.

¶22 "[P]arents who make appreciable, good faith efforts to comply with remedial programs outlined by [DCS] will not be found to have substantially neglected to remedy the circumstances that caused out-of-home placement, even if they cannot completely overcome their difficulties" within the statutory timeframe. *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 576 (App. 1994).

> In making a determination that a parent has substantially neglected or willfully refused to remedy the circumstances which cause the child to be in an out-of-home placement . . . we construe those circumstances . . . to mean those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children.

*Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007) (citation and internal quotation marks omitted).

¶23 Here, the superior court found that Father's rehabilitation efforts were "too little too late." We agree. Father failed to participate in substance abuse services, failed to participate in urinalysis testing, and failed to complete domestic violence classes or counseling. At the time of the termination adjudication hearing, DCS could not safely return the children to Father's care because he had not "shown the appropriate behavior[al] changes needed to maintain and meet the children's basic needs." As the Tribe noted in its answering brief, although Father began availing himself of some services and began engaging more consistently in visitation "late in the proceeding . . . [his] efforts were sporadic and insufficient to demonstrate an ability to care for the children." Reasonable evidence supported the superior court's finding that termination was warranted pursuant to A.R.S. § 8-533(B)(8)(a), (b).

¶24 Because we affirm the superior court's termination of Father's parental rights to the children on out-of-home placement grounds, we need not consider his challenge to the alternate ground of neglect. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

III.    Best Interests

**¶25**        Finally, Father argues the superior court erred by finding that termination of his parental rights was in the children's best interests. Termination is in a child's best interests if the child would "derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004). The superior court may find that a child would benefit from termination if there is an adoption plan or if the child is adoptable. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150-51, ¶¶ 13-14 (2018). The court "may take into account that '[i]n most cases, the presence of a statutory ground will have a negative effect on the children.'" *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013) (quoting *Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988)). In making the best interests determination, the superior court must "evaluate the totality of circumstances, which may include the bond between the . . . parent and the child, the availability of a prospective adoptive placement, risk for abuse or neglect if the relationship is not terminated, and placement with siblings." *Timothy B. v. Dep't of Child Safety*, 250 Ariz. 139, 145, ¶ 20 (App. 2020) (internal citation and quotation marks omitted).

**¶26**        Father argues the superior court failed to "evaluate the totality of the circumstances" here, including his rehabilitation efforts and the fact that D.C. and N.C. opposed termination of his parental rights. We disagree.

**¶27**        DCS case manager Jesenia Chacon testified that the children were adoptable and that the Tribe had identified potential ICWA-preferred adoptive placements for all of the children. Chacon also testified that termination would serve the children's best interests because it would provide them with permanency, safety, and stability.

**¶28**        The superior court considered the totality of the circumstances, including D.C.'s and N.C.'s objections to the termination motion and Father's inconsistent and incomplete rehabilitation efforts, and found that termination was in the children's best interests. Besides freeing the children for adoption, the court noted that termination would "more importantly" allow them "to be raised with structure and support" so that they could "thrive [and] address their past traumas . . . ." Reasonable evidence supports the superior court's best interests finding.

## CONCLUSION

¶29       For the foregoing reasons, we affirm the superior court's order terminating Mother's and Father's parental rights to the children.



AMY M. WOOD • Clerk of the Court
FILED:    AA