NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.S. AND M.S.

No. 1 CA-JV 23-0084
FILED 10-3-2023

Appeal from the Superior Court in Maricopa County
No. JD37235
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Clark Jones, Esq., Mesa
*Counsel for Appellant*

Rothstein Donatelli LLP, Tempe
By April Olson, Glennas'ba Augborne Arents, Jordan Hale
*Counsel for Appellant Navajo Nation*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee, DCS*

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court,
in which Judge Kent E. Cattani and Judge Anni Hill Foster joined.

**C A M P B E L L**, Judge:

¶1        Marcine C. (Mother) and the Navajo Nation appeal the superior court's order terminating Mother's parental rights to her Indian children Megan (born in November 2018) and Michael (born in March 2020).[1] Mother and the Navajo Nation assert that the Department of Child Safety (DCS) failed to make active reunification efforts. We affirm because DCS made sufficient efforts under both A.R.S. § 8-533(B)(8)(c) and 25 U.S.C. § 1912 of the Indian Child Welfare Act (ICWA).

## BACKGROUND

¶2        Mother has a long history of alcohol abuse and mental-health issues leading to four older children being removed from her care. In November 2018, DCS received a report that Mother was consuming alcohol while pregnant with Megan. By the time Megan was born, Mother had completed an inpatient substance-abuse treatment program and was living in a sober-living home. Because Megan was able to live with Mother in the sober-living home, DCS left Megan in Mother's care.

¶3        When Megan was a few months old, Mother left the sober-living home against her program counselors' advice. She stopped taking her medication and began experiencing suicidal ideation. DCS filed a dependency petition that included Megan, but left Megan in Mother's care. Mother and Megan returned to Father, but neither had stable housing and the parents engaged in acts of domestic violence. In June 2019, Mother left Megan with Megan's paternal grandmother, who became the child's official placement. In March 2020, Mother gave birth to Michael, and DCS also placed him with the paternal grandmother.

¶4        Over the next several years, DCS offered Mother multiple services including substance-abuse testing and treatment, a psychological evaluation, counseling, parent-aide services, supervised visits, in-home support services, housing resources, and transportation. Following Michael's birth, she engaged in services and the court moved to return him to her custody.[2] Michael was returned to Mother but later removed due to Mother's relapse.

---

[1]        Pseudonyms are used to protect the children's identities. The children's father is deceased.

[2]        Megan remained with the paternal grandmother at this time because Mother's housing program did not allow children over age one.

¶5        By July 2020, Mother had attained five months of sobriety and had actively engaged in services. The only barrier to reunification was housing, which was difficult to obtain because Mother had a felony conviction.

¶6        In January 2021, Mother relapsed with alcohol, but within a few weeks she reengaged in substance-abuse treatment. Nevertheless, her drug testing was sporadic, and she tested positive for ETG, a byproduct of alcohol, on at least two occasions when she did test. She also did not follow through with a housing plan or complete the treatment program. Her visits with the children were also inconsistent. Mother then stopped communicating with DCS for several months.

¶7        In December 2021, Mother resumed services, but over the next year her participation was intermittent. Although she had periods of sobriety in the summer and fall of 2022, she relapsed in November, and communication between Mother and DCS was sparse. By February 2023, Mother had begun and left several substance-abuse treatment programs, relapsing each time.

¶8        Due to Mother's lack of engagement, DCS moved to terminate her parental rights based on the substance-abuse and fifteen-months out-of-home placement grounds. *See* A.R.S. § 8-533(B)(3), (8)(c). She did not appear at trial, and the superior court found she lacked good cause for her absence. The Navajo Nation's expert testified that DCS had not made active efforts to preserve the Indian family under ICWA. *See* 25 U.S.C. § 1912(d). According to the expert, DCS had a high turnover of case managers, did not maintain regular contact with Mother, was not proactive in locating Mother when she was out of contact, and had not made sufficient efforts to help her with housing, "which resulted in [her] not reunifying [with] her children the first time." Ultimately, the superior court found that DCS had made active efforts to assist Mother and terminated her parental rights on the grounds alleged. Mother and the Navajo Nation appealed.

## DISCUSSION

¶9        A parent's right to the companionship, care, custody, management, and association of her children is a fundamental, constitutionally protected right. *Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 200, ¶ 8 (App. 2002). These fundamental rights continue even if the natural parent struggles to care for their child. *Id.*

¶10       Even so, a parent's right to custody and control of her child is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49,

¶¶ 11-12 (2000). Severance of a parental relationship may be warranted where the State proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005). The court must also find that severance is in the child's best interests by a preponderance of the evidence. *Id.* at 285, ¶ 29. And when the child is an Indian child, 25 U.S.C. § 1912 requires the court to find by evidence beyond a reasonable doubt that the parent's continued custody of the child is likely to result in serious emotional or physical damage to the child, and by clear and convincing evidence that DCS made "active efforts" to preserve the Indian family. *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 420, ¶¶ 20, 26 (App. 2011) (quoting 25 U.S.C. § 1912(d)).

**¶11** This Court will accept the juvenile court's factual findings "if reasonable evidence and inferences support them" and will affirm the court's legal conclusions unless they are clearly erroneous. *Brionna v. Dep't of Child Safety*, 533 P.3d 202, ¶¶ 30–31 (Ariz. 2023) (citation omitted). Mother and the Navajo Nation's appeals are limited to the superior court's findings that DCS made sufficient reunification efforts for purposes of A.R.S. § 8-533(B)(8)(c) and 25 U.S.C. § 1912.[3]

**¶12** To begin, DCS argues that Mother and the Navajo Nation waived their arguments by not raising them promptly in superior court. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178–79, ¶¶ 13–18 (App. 2014) (to avoid waiver, party must raise a timely objection if she believes services are inadequate). Although the superior court held several hearings where Mother or the Navajo Nation could have voiced their concerns, they did not do so. After her first relapse, Mother told the DCS case manager she relapsed "due to [her] feeling overwhelmed and defeated in not finding housing." She did not ask for any additional services, and at that time, DCS was actively helping Mother seek appropriate housing. Similarly, the Navajo Nation's expert testified that she voiced her concerns about DCS's rotation of case managers and lack of contact with Mother in August 2022. But she did not bring the issue to the attention of the court, nor did she follow up with DCS. Ultimately, Mother and the Navajo Nation needed to raise their concerns early enough to allow the court and DCS "a reasonable

---

[3] We therefore consider any challenges to the balance of the court's findings waived. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577–78, ¶ 5 (App. 2017).

opportunity to . . . make appropriate changes." *Id.* at 179, ¶ 18. In failing to do so, they have waived this issue.

¶13 Waiver notwithstanding, Mother and the Navajo Nation have not established that DCS failed to make active efforts to provide remedial services and rehabilitative programs to try to keep the Indian family together. First, severance for time-in-care grounds under A.R.S. § 8-533(B)(8)(c) requires, among other things, that DCS "made a diligent effort to provide appropriate reunification efforts." To satisfy its obligation to make diligent efforts, DCS must provide the parent with an opportunity to participate in programs designed to help her become an effective parent. *In re Appeal in Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). Even so, it need not "provide every conceivable service," ensure the parent participates in services, provide duplicate services, or undertake reunification efforts that are futile. *Id.*; *In re Pima Cnty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). Nor is it required to "[l]eav[e] the window of opportunity for remediation open indefinitely." *In re Appeal in Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994).

¶14 Second, severance under 25 U.S.C. § 1912 requires that DCS made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." DCS satisfies this obligation when it makes "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family" and "assist[s] the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." 25 C.F.R. § 23.2. But as with reunification services, "active efforts" in this regard do not require DCS to "provide every imaginable service or program designed to prevent the breakup of the Indian family." *Yvonne L.*, 227 Ariz. at 423, ¶ 34.

¶15 The Navajo Nation argues that DCS did not "actively assist Mother with housing which led to her relapse" and that there is "no specific evidence in the record for the juvenile court to have relied on to determine the adequacy of the housing assistance." We disagree. The record contains specific evidence of DCS's active efforts to help Mother find housing. Over the course of the dependency, Mother was given at least three housing subsidies and a dedicated Section 8 subsidized housing caseworker to help her locate and obtain accommodations. By November 2020, Mother had located a potential home using a housing voucher, and DCS reported it was ready to provide Mother with a housing subsidy. The vendor, however,

stopped communicating with Mother and DCS. By May 2021, Mother had developed another housing plan, but she did not follow through and left her sober-living facility prematurely. After leaving that facility, Mother did not consistently address her substance-abuse or mental-health issues, or continue to pursue adequate housing.

¶16 Mother argues that DCS "fail[ed] to communicate frequently enough" with her, "chang[ed] case managers so frequently that it precluded the necessary rapport," and left her to seek out her own providers for services. The Navajo Nation also asserts that DCS did not provide sufficient "face-to-face" contact, and that it did not "actively assist Mother to get back on track with her case plan after her relapse." The record belies these arguments.

¶17 DCS offered Mother several different lines of communication through case-management services, psychological evaluations and counseling, and child support services—all designed to keep her engaged in substance-abuse treatment and child visitation. Moreover, the record shows that DCS was actively communicating with Mother when she provided contact information.

¶18 DCS maintained regular contact with Mother until January 2021, when she disappeared for two weeks. In February, DCS regained contact with Mother, learning she had relapsed. Although offered substance-abuse treatment after her relapse, Mother did not engage. In May 2021, Mother provided DCS with updated contact information, and DCS reported it was "currently working with [M]other to reengage her" in services. By June, Mother had not re-engaged in services or communicated with DCS. Mother re-engaged in December 2021, and the case manager ensured she had substance-abuse testing, psychological evaluations, and visits with her children available to her. Through July 2022, and despite Mother's inconsistent engagement, DCS attempted to stay in contact with Mother and to provide her opportunities to participate in services.

¶19 Although the Navajo Nation advocates for a more personalized approach, including "face-to-face" contact, that is not the benchmark for determining whether the services provided by DCS were sufficient. Here, the record shows that DCS continued to provide Mother services following her multiple relapses, unsuccessful treatment attempts, and disappearances over the course of the dependency proceedings. DCS presented evidence of its many attempts to engage with Mother over several communication platforms, including telephone and email. Mother's case manager testified she attempted contact with Mother "as much as [she]

could during the week." At least one provider tried to maintain contact with Mother each week while in their program.

¶20 Finally, Mother argues DCS "left [her] to seek out her own providers for services." While DCS allowed Mother to seek out treatment options she preferred, DCS also referred Mother to substance-abuse treatment through its provider. This dual referral was to ensure Mother had access to services if she could not obtain them on her own. We therefore find no error. *See Pima Cnty Severance action No. S-2937.*, 161 Ariz. at 577.

¶21 Sufficient evidence supports the superior court's finding that "[a]lthough more could have been done to assist" Mother, DCS "made diligent and active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." *See Brionna*, 533 P.3d at ¶¶ 30–31. We therefore uphold the severance. *See id.* ¶ 31.

## CONCLUSION

¶22 We affirm for the reasons set forth above.



AMY M. WOOD • Clerk of the Court
FILED: AA